## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| BRUCE L. FRAKES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-5390 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| NORTHEAST ILLINOIS REGIONAL | ) | |
| COMMUTER RAILROAD | ) | |
| CORPORATION d/b/a METRA RAIL, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### <u>MEMORANDUM OPINION AND ORDER</u>

Bruce Frakes worked as a superintendent at Metra Rail. One afternoon, he got into an argument with a subordinate, John Frencher, and they got a bit testy with each other. They exchanged words, but not blows. After the fracas, Frakes told his supervisors about the incident, and claimed that Frencher had charged him in an aggressive manner. He painted a picture of a confrontation that nearly became physical.

That story didn't hold up well. A nearby security camera captured what happened, and the video footage did not show any aggressiveness by Frencher. The supervisors watched the tape and were underwhelmed with Frakes's exaggerated story-telling. So Frakes accepted a demotion and waived further fact-finding. He retired three months later.

Frakes did not go away quietly. He later sued his supervisors and Metra Rail, alleging a denial of due process and reverse race discrimination. Defendants moved for summary judgment. For the reasons stated below, the motion is granted.

## Background

Frakes, a white man, joined Metra Rail (*i.e.*, Northeast Illinois Regional Commuter Railroad Corporation) as a carman in 1988. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 8 (Dckt. No. 79). A carman works on "any type of repairs to any seats, windows, anything in the interior nonelectrical [or] nonmechanical" on the trains. *See* Clifford Dep., at 30:8-12 (Dckt. No. 69-2).

He worked his way up the ladder. By 2012, Frakes held the position of superintendent, a managerial role in charge of the facilities' maintenance schedules, inspections, and compliance with safety regulations. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 9 (Dckt. No. 79). His role was to "run the shop," meaning that he was responsible for repairing and inspecting Metra trains. *See* Clifford Dep., at 31:19 – 32:22 (Dckt. No. 69-2).

On September 25, 2017, John Frencher (an electrician) was tasked with cleaning the pins on the highliner couplers. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 40 (Dckt. No. 79); Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 14 (Dckt. No. 98). That job basically involved cleaning the parts that join railroad cars. *See* Rojas Dep., at 39:12-18 (Dckt. No. 69-5); Clifford Dep., at 54:21 – 55:5 (Dckt. No. 69-2). The parties don't explain who gave Frencher that task (hence the passive voice in the topic sentence of this paragraph). But for present purposes, the important thing is that the job of cleaning the pins was on Frencher's plate.

It wasn't on his plate for long. Frencher felt that the task was dangerous, so he brought a "good faith challenge" to his superior, Joseph Louis, who in turn told his supervisor, Frakes. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 38 (Dckt. No. 79); Rojas Dep., at 78:15-24 (Dckt. No. 69-5). A "good faith challenge" is a way for employees to challenge an assigned task for safety reasons, and to discuss safety concerns comfortably with their managers. *See* Pl.'s Resp.

2

to Defs.' Statement of Facts, at ¶ 37; McCann Dep., at 88:5-17 (Dckt. No. 69-3). Once an employee raises a challenge, the goal is to "ascertain if there's a safety situation and if there's a safer or better way to do something." *See* McCann Dep., at 88:13-14. If the parties can't resolve the issue, a manager may reassign the employee to another task. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 39.

So Frencher raised a good faith challenge to that particular assignment. The parties disagree about what, exactly, happened next. They agree that Frakes and Frencher had a confrontation, but they characterize the level of severity differently.

Frakes paints Frencher as a bad apple who refused take orders and follow instructions. According to Frakes, he reassigned Frencher and gave him another task after he raised a challenge to cleaning the pins. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 14 (Dckt. No. 98). Frakes's supervisors, Defendants Kevin Clifford and Frank Rojas, knew about the reassignment, and Rojas even told Frencher to do what Frakes said. *See* Pl.'s Statement of Additional Facts, at ¶ 14 (Dckt. No. 80). But Frencher refused the second task as well, for no apparent reason. *Id.*; Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 40 (Dckt. No. 79). Frakes then told Frencher to sit down while he contacted Rojas to resolve the situation. *See* Pl.'s Statement of Additional Facts, at ¶ 14.

Instead of sitting (again, according to Frakes), Frencher walked to Frakes's office and loudly "pounded his closed fist" on the steel door. *Id.* at ¶ 15; Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 41 (Dckt. No. 79). As an aside, the parties leave some gaps in the story, and don't paint a clear picture of where, exactly, Frencher was before Frakes told him to sit down. But the key point is that Frencher arrived at Frakes's door.

As Frakes tells it, he opened the door and told Frencher to step into his office because Frakes intended to remove him from service. *See* Pl.'s Statement of Additional Facts, at ¶ 15 (Dckt. No. 80). That's when Frencher supposedly "charged towards Frakes," prompting another Metra employee to jump in and hold Frencher back. *Id.*

Defendants offer a different version of what transpired. As they tell it, Frakes improperly reassigned Frencher to a task that required preapproval from the union. *See* Defs.' Statement of Facts, at ¶¶ 39–40 (Dckt. No. 69). Frencher refused (presumably because of the lack of union approval), and Frakes responded by threatening to remove him from service for insubordination. *Id.* at ¶ 40.

Not much later, Frencher knocked on Frakes's door but walked away before anyone answered. *Id.* at ¶ 41. The knocking agitated Frakes, so he opened the door, pointed his finger at Frencher, and exclaimed that he was "going to call somebody on him for his actions." *Id.* at ¶ 42. Frencher then turned around to face Frakes, but another Metra employee stepped between the two men and deescalated the situation. So Frencher walked away. *Id.*

Everyone agrees that the two men had an unpleasant interaction. But they disagree about the level of severity. For present purposes, the most important thing is the claim by Frakes that Frencher had charged him.

After the interaction, Frakes told his superiors (again, Rojas and Clifford) that Frencher had charged him. So they allowed Frakes to remove Frencher from service. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 17 (Dckt. No. 98).

That same day, Frakes pulled security footage of the incident and gathered witness statements. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 46 (Dckt. No. 79); Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 25 (Dckt. No. 98). Also on the same day, he prepared

4

his own written statement about the incident.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at

¶ 50.  Frakes then supplied his written statement to the individual Defendants.  *See* McCann

Dep., at 112:15 – 113:16 (Dckt. No. 69-3)

The parties did not include the written statement by Frakes in the summary judgment

record.  But the parties do characterize what it said.  Frakes's statement repeated the story he

alleges in this case:  Frencher was aggressive and charged towards him, requiring another Metra

employee to put up his arms to keep Frencher back.  *See* Pl.'s Resp. to Defs.' Statement of Facts,

at ¶ 50 (Dckt. No. 79).

Later that day (September 25), Frakes and Rojas went to Metra headquarters so that

Frakes could tell his supervisors – Defendants Kevin McCann, Janice Thomas, and Clifford –

what happened in person.  *Id.* at ¶ 47.

They played the video at the meeting.  *Id.* at ¶ 49.  The tall tale by Frakes then fell apart,

for everyone to see.  The video showed that Frencher was not physically aggressive.

The four Metra personnel (the four individual Defendants in this action) then met

together and agreed:  Frakes's account of the events, including his written statement, was simply

untrue.  *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 25 (Dckt. No. 98); Clifford

Dep., at 80:7 – 81:12, 98:20-24 (Dckt. No. 69-2); McCann Dep., at 124:3-14 (Dckt. No. 69-3);

Thomas Dep., at 34:8-22, 72:18 – 74:20 (Dckt. No. 69-4); Rojas Dep., at 48:22 – 50:10 (Dckt.

No. 69-5).

This Court watched the video, too, and confirmed that Frencher did not charge Frakes in

an aggressive manner.  At most, Frencher took a few steps in the direction of Frakes, without

engaging in anything close to a bull rush toward his supervisor.  *See Scott v. Harris*, 550 U.S.

372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly

contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

The video did not capture the entire interaction. The camera was situated at one end of a long corridor of some kind. *See* Incident Video, at 08:48:22 (Dckt. No. 69-16). Frakes and Frencher appeared somewhat off in the distance, and the view isn't perfect. But it shows enough.

Frakes's office door was not visible on camera, so the footage does not show whether Frencher was knocking or pounding on the door. But the parties agree that the altercation occurred outside Frakes's office. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 41 (Dckt. No. 79).

The footage begins with Frencher exiting Frakes's office (again, the office door is not visible) and walking away. *See* Incident Video, at 08:48:24 (Dckt. No. 69-16). Frencher took five or six steps away from the office (down the corridor, toward the camera). Frakes then entered the corridor, behind Frencher, and appeared on camera, too. He pointed at Frencher – in an emphatic gesture – and said something to him before heading back toward his office (and leaving the view of the camera). *Id.* at 08:48:29. In those few seconds, Frakes moved more quickly than Frencher, and if anything, his body language appeared more animated. *Id.*

In response, Frencher turned around and faced the direction of Frakes (again, who was then off camera). Frencher then took five or six steps toward Frakes, at a relaxed, normal pace. *Id.* at 08:48:35. At that point, only Frencher is visible on camera. He then stopped, did a bit of a stutter-step or shuffle, and perhaps leaned forward a little. *Id.* at 08:48:37. Nothing major.

But there was no charge. At no point during their interaction did Frencher charge or move in a physically aggressive manner.

Another Metra employee then appeared next to Frencher, in between Frencher and the office. But he didn't have to dive between two men who were inches part, close to exchanging blows.

That third person then walked back down the corridor with Frencher, away from Frakes's office. *Id.* at 08:48:40. The relevant video clip of the interaction – beginning with Frakes pointing at Frencher – lasts no more than 10 seconds.

The next day (September 26), McCann and Clifford brought the incident to Metra's Disciplinary Committee. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 51 (Dckt. No. 79). After learning about the incident, the video, and the false story told by Frakes, the Committee decided to move forward with a fact-finding review of the events. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 28 (Dckt. No. 98).

McCann, Clifford, and Rojas then met with Frakes and gave him a choice: participate in the Committee's fact-finding process, or accept a demotion to Sr. Rail Inspector. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 52 (Dckt. No. 79). Frakes takes issue with the notion that he had a genuine choice. *Id.* But the following day (September 27), Frakes signed a waiver of fact-finding review and accepted the demotion. *Id.* at ¶ 53.

According to Frakes, he had a rough ride in his new role as a Sr. Rail Inspector. First, his supervisor, Rick Valero (a non-party), gave him the nickname "Brucifer." *Id.* at ¶ 58. Frakes took offense at the nickname, but never told Valero that he didn't like it. *Id.* at ¶ 59. Second, three months after his demotion, he received a negative trial performance appraisal. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 38 (Dckt. No. 98). Third, his supervisors vaped in the office within his vicinity, causing him discomfort. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 63 (Dckt. No. 79).

On December 12, the day of his negative evaluation, Frakes felt "fed up" and filed an injury report with Metra, describing his exposure to his supervisors' vaping. *Id.* at ¶ 62; Frakes Dep., at 229:4-11 (Dckt. No. 69-6). He then took a vacation. When he returned, he retired, leaving the company on December 31, 2017. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 66 (Dckt. No. 79).

Frakes filed a complaint in August 2018 and amended it in September. *See* Cplt. (Dckt. No. 1); Am. Cplt. (Dckt. No. 8). He later filed a second amended complaint with four claims against Metra Rail and four individual Defendants (Thomas, Clifford, McCann, and Rojas). *See* Second Am. Cplt. (Dckt. No. 24).

Count I alleges that the individual Defendants deprived him of property without due process. That claim has two theories. The first theory is that the Defendants demoted him without any opportunity to present his case. The second theory is constructive discharge.

Count II is a claim of reverse race discrimination against Metra Rail.

Frakes also brought claims for age discrimination (Count III) and retaliation (Count IV) in his second amended complaint, but Frakes abandoned those claims after Defendants moved for summary judgment. Frakes moved to voluntarily dismiss those two claims, which this Court granted. *See* Pl.'s Mtn. to Dismiss (Dckt. No. 93); 12/18/20 Order (Dckt. No. 101).

In sum, there are two remaining claims. Count I is a due process claim against the individual Defendants, with two theories of liability, and Count II is a reverse race discrimination claim against Metra.

**Legal Standard**

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Discussion

### I. Due Process (Count I)

The first claim is a due process claim, and Frakes puts forward two theories. The first theory is that Metra demoted him without a hearing. The second theory is that Metra forced an involuntary resignation. The Court will address each theory in turn.

### A.      Denial of Fact-Finding Review (Theory I)

#### i.      Protected Property Interest

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." *See* U.S. Const. amend. XIV, § 1.  A due process claim has two elements.  A plaintiff must prove a "(1) deprivation of a protected interest and (2) insufficient procedural protections surrounding that deprivation." *Michalowicz v. Village of Bedford Park*, 528 F.3d 530, 534 (7th Cir. 2008); *see Bradley v. Village of Univ. Park*, 929 F.3d 875, 882 (7th Cir. 2019).

The first element requires a protected property interest.  The Constitution presupposes, but does not create, property interests. *See Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) ("Property interests are, of course, not created by the Constitution . . . .").  Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*; *see also Bradley*, 929 F.3d at 882 ("For public employees, a protected property interest in employment can arise from a state statute, regulation, municipal ordinance, or an express or implied contract.") (cleaned up).

"[A] government promise that an employee can be fired only for good cause creates a substantive property right in secure employment." *Manley v. L.*, 889 F.3d 885, 893 (7th Cir. 2018).  The same principle applies to an employee's specific position, pay rank, or status – provided that the express rule requires a substantive criteria before the government deprives the employee of his or her protected interest. *See Sonnleitner v. York*, 304 F.3d 704, 711 (7th Cir. 2002) (holding that "it is undisputed that [the plaintiff] possessed a property interest in his supervisory position by virtue of his employment with the state" because the relevant Wisconsin

statue required just cause for removal, suspension, discharge, or reduction in pay); *Miyler v. Village of E. Galesburg*, 512 F.3d 896, 898 (7th Cir. 2008) ("In order to create a property interest, a statute or ordinance must provide some substantive criteria limiting the state's discretion, as for instance in a requirement that employees can only be fired for cause.") (cleaned up).

Express rules are sufficient – but not *necessary* – to establish an employee's protected property interest. A property interest also can arise out of unwritten "mutually explicit understandings" between an employee and an employer, or an employee's "legitimate and reasonable reliance" on a supervisor's promise. *See Hannon v. Turnage*, 892 F.2d 653, 658 (7th Cir. 1990); *see also Heck v. City of Freeport*, 985 F.2d 305, 310 (7th Cir. 1993). In either circumstance, "a '*de facto*' unwritten or implied policy is sufficient to create an entitlement and protectable property interest." *Forgue v. City of Chicago*, 873 F.3d 962, 970 (7th Cir. 2017) (citation omitted).

In these unwritten-rules cases, an individual employee must have more than "an abstract need or desire or a unilateral expectation to possess a cognizable entitlement." *Id.* (quotation marks and citation omitted); *see also Deen v. Darosa*, 414 F.3d 731, 734 (7th Cir. 2005). In other words, an employee can't rely on "I thought so" or "I hoped so" to show a property interest. The relevant supervisor also must recognize the employee's property interest or, at the very least, act in some manner consistent with the existence of such interest.

In addition, a party can prove a "mutually explicit understanding" with evidence of an established custom or policy. *See Davis v. City of Chicago*, 841 F.2d 186, 188 (7th Cir. 1988). But the understanding must be truly mutual. A party using "evidence of custom or policy to establish a mutually explicit understanding" capable of giving rise to a legitimate claim of

entitlement to a property interest "must demonstrate an expectation that was legally enforceable, a mutually binding obligation." *See Common v. Williams*, 859 F.2d 467, 470 (7th Cir. 1988) (cleaned up). In these instances, the plaintiff bears the burden of proof. *See Tranchita v. Callahan*, 511 F. Supp. 3d 850, 877 (N.D. Ill. 2021) (citing *Crull v. Sunderman*, 384 F.3d 453, 465 (7th Cir. 2004)).

A "mutually explicit understanding" that constitutes a property interest "cannot be based on the representations of government officials who are not authorized to make such representations." *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1334 (7th Cir. 1989); *see Santella v. City of Chicago*, 936 F.2d 328, 332 (7th Cir. 1991) ("Promises may have been made to [the plaintiff]. They might even have been made by some very influential people. But because they were not made by the only person who counted, they were unauthorized, nonbinding, and without legal effect.").

Here, the first question is whether Frakes had a protected property interest. Frakes's second amended complaint asserts that he had "a protectable property interest in maintaining his employment." *See* Second Am. Cplt., at ¶ 21 of Count I (Dckt. No. 24).[1]

Defendants interpret Frakes's complaint as alleging a property interest in his *managerial* position in relation to a demotion, not a more general property interest in keeping his employment. *See* Defs.' Mtn. for Summ. J., at 6 (Dckt. No. 72). That is, Defendants concede that Frakes had a property interest in his employment with Metra and that he could not be *discharged* without due process. They dispute whether he could be *demoted* without due process.

---

[1] The second amended complaint repeats the same numbers when numbering the paragraphs. The facts appear in paragraphs 1–20. Count I runs from paragraph 21–24. But instead of starting with paragraph 25, Count II reuses #21. So Count I has a paragraph 21, and so does Count II, and so do Counts III and IV.

Defendants observe that the Regional Transportation Authority Act ("RTA Act") provides that Metra Rail "shall establish regulations to insure that its discharges shall not be arbitrary and that hiring and promotion are based on merit." *See* 70 ILCS 3615/3B.05. But, importantly, the RTA Act doesn't mention demotions. It covers both sides of one coin (hiring/firing), but only one side of the other coin (promotion, but not demotion). In addition, Metra's Handbook requires "Fact Finding Review" for the disciplinary consequence of "suspension without pay," and it requires a "Pre-Termination Hearing" for the disciplinary consequence of "termination." *See* Employee Conduct, at 7–9 (Dckt. No. 69-10). But the Handbook lacks any requirements for demotions.

So, according to Defendants, despite having a property interest in his *employment* with Metra Rail, Frakes lacks a property interest in his specific *position* with Metra Rail. *See* Defs.' Reply in Support of their Mtn. for Summ. J., at 3 (Dckt. No. 97) ("Plaintiff fails to establish he has a property interest *in his position from demotion*.") (emphasis in original). Frakes never challenges Defendants' interpretation of his claim.

The Court therefore understands Frakes as arguing that he had a property right in his pre-demotion position as superintendent, not simply a right in his more general employment with Metra.

As mentioned above, an employee can establish a protected property interest in his employment by presenting evidence of an express rule or an unwritten understanding. An employee also can demonstrate a protected property interest in his specific *role* by offering evidence of an express rule. *See, e.g.*, *Sonnleitner*, 304 F.3d at 711 (holding that the plaintiff had a property interest in his position because a Wisconsin statute stated "an employee with permanent status in class may be removed, suspended without pay, discharged, reduced in base

pay or *demoted* only for just cause") (cleaned up) (emphasis added); *Akande v. Grounds*, 555 F.3d 586, 590 (7th Cir. 2009) ("[S]tate law defines [the plaintiff's] property right as the right not to be removed, discharged, *demoted*, or suspended for more than thirty days without cause.") (emphasis added); *Sowers v. City of Fort Wayne*, 737 F.2d 622, 625 (7th Cir. 1984) (holding that the plaintiff had a property interest in a specific rank because an Indiana statute provided that "every member of the fire and police forces, with the exception of the fire and police chiefs, shall hold *office or grade* until they are removed by the Board of Public Safety or the Board of Metropolitan Police Commissioners") (cleaned up) (emphasis added); *see also Forgue*, 873 F.3d at 970.

One would think that an employee could demonstrate a property interest in a specific *role* by offering evidence of an unwritten understanding, too (and not only by offering evidence of an express rule). If evidence of an unwritten understanding is enough to create a property interest, then it should not matter whether that interest involves employment (in general) or a specific role.

Defendants are correct that there is no express rule or regulation protecting Frakes's pre-demotion rank. The RTA Act does not mention merit-based demotions, and the Metra Handbook does not require any hearing or review before demotions. *See* 70 ILCS 3615/3B.05; Employee Conduct (Dckt. No. 69-10); *Border v. City of Crystal Lake*, 75 F.3d 270, 273 (7th Cir. 1996) ("[P]romises made in an employee handbook can give rise to a legitimate claim of entitlement sufficient to be protected as a property interest."). Notably, Frakes's loss of income because of his demotion is irrelevant to whether he had a constitutionally protected interest. *See Akande*, 555 F.3d at 591 ("A showing of economic harm is a requirement for damages, not a theory for establishing a constitutional deprivation.").

14

So Frakes lacked a property interest in his role as superintendent based on a state statute, regulation, municipal ordinance, or contract. Frakes himself seems to concede as much.

But that's not the end of the story. Despite the lack of any express rules establishing Metra's procedure for demotions, Frakes maintains that there was a mutually explicit understanding at Metra that "as a managerial employee, he was entitled to the standard company fact-finding review." *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J. ("Frakes Mem."), at 4 (Dckt. No. 78).

According to Frakes, Metra always provided employees with an investigation and the option of fact-finding review before demotions. *See* Frakes Dep., at 166:20 – 167:11 (Dckt. No. 69-6). Frakes bases this mutually explicit understanding on his personal experiences and what he heard from other Metra employees. *Id*.

Similarly, Defendant Rojas testified that when he (Rojas) was previously demoted from superintendent to a union electrician, he was given the option of fact-finding review. *See* Rojas Dep., at 39:12-18 (Dckt. No. 69-5). Rojas also said that all non-contract employees (which includes superintendents) were entitled to fact-finding hearings before any disciplinary actions like demotions. *See id.* at 54:12-17.[2]

In addition, Frakes points out that the Disciplinary Committee gave him the option of fact-finding review in this very case. That act, by itself, reveals the existence of a mutual understanding that Frakes was entitled to further review. Employers are not in the habit of

---

[2] There is some slippage between "managerial employees" and "non-contract employees" in the parties' filings. Frakes's complaint and response brief allege that managerial employees, like Frakes, were entitled to Metra's fact-finding review. *See* Second Am. Cplt., at ¶ 14 (Dckt. No. 24); Frakes Mem., at 4 (Dckt. No. 78). But neither parties' statements of material facts ever reference managerial employees, opting instead for "non-contract employees." Yet it is only in Defendants' summary judgment motion, and not their statement of facts, that Frakes is defined as a non-contract employee. *See* Defs.' Mtn. for Summ. J., at 3 (Dckt. No. 72). Regardless, the parties don't contest that Rojas's statement would apply to Frakes's position as superintendent.

asking employees to waive rights that don't exist. According to Frakes, it would be strange to suggest that the Disciplinary Committee offered him a waiver of fact-finding review out of the goodness of their hearts and not as a matter of standard practice.

Frakes has presented enough evidence to support a finding by a reasonable jury that Metra had a custom of providing pre-deprivation hearings before demotions to managerial employees (like superintendents). Frakes presented (1) his own knowledge of Metra practices; (2) Defendant Rojas's testimony on Metra practices; and (3) the Disciplinary Committee's offer of fact-finding review in his own case.

Defendants offered no evidence rebutting the existence of a custom. And there is no indication that Frakes's entitlement to seek further fact-finding review before his demotion was an outlier or against express rules forbidding such review. *See Auriemma v. City of Chicago*, 601 F. Supp. 1080, 1083 (N.D. Ill. 1984) (denying a motion to dismiss the plaintiffs' due process claim because the plaintiffs alleged a custom of merit-based job decisions, the plaintiffs were demoted without any hearings, and "[t]he alleged custom could very well supplement rather than contradict the Rules"). Finally, Frakes does not improperly rely on promises from lower-ranked employees who cannot bind Metra. Instead, he points to a custom (not a promise) of offering deprivation hearings.

Based on the evidence in the record, a reasonable jury could make a finding that there was a custom at Metra to offer superintendents a pre-deprivation hearing before demotions. *See Smith v. Village of Maywood*, 1987 WL 14012, at *2 (N.D. Ill. 1987) ("Questions as whether the plaintiff and defendants reached such 'mutually explicit understandings' [are] best determined by the trier of fact."). On the issue of whether Frakes had a protected property interest in his role as superintendent, summary judgment is denied.

16

### ii.    Insufficient Procedural Protection

A due process claim has two elements:  (1) a deprivation of a protected interest; and (2) insufficient procedural protections surrounding that deprivation.  *See Michalowicz*, 528 F.3d at 534.  As already described, Frakes has sufficiently shown a protected property interest in his rank based on a custom at Metra of offering fact-finding review before demotions of managerial employees.

The second element is the lack of a procedural protection.  Here, Frakes argues that the state took something away from him without affording him "process" that was "due."  *See* U.S. Const. amend. XIV, § 1.  To bring a claim, he must show that there were insufficient procedural protections before his demotion.

Due process is "a flexible concept that varies with the particular situation."  *Hamlin v. Vaudenberg*, 95 F.3d 580, 584 (7th Cir. 1996) (quotation marks omitted).  In any particular case, a court must balance three distinct factors:  "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Bradley*, 929 F.3d at 882 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

"When a public employee has a property interest in his or her job, the constitutional requirements for predeprivation procedures are well-established:  notice of the proposed deprivation, a statement of reasons, and an opportunity to be heard in response."  *Id.* (citing *Roth*, 408 U.S. at 569–70).  "[I]n the normal course of terminating a public employee who has a property interest in his or her job, 'the root requirement of the Due Process Clause' is the

17

provision of adequate notice and 'some kind of a hearing' to a public employee '*before* he is deprived of any significant property interest.'" *Id.* (emphasis in original) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)).

That said, an employee cannot complain about the lack of due process after failing to take advantage of the process afforded to him. The Seventh Circuit has "frequently held that terminated employees who do not avail themselves of pre-termination hearings waive their right to contest the adequacy of such hearings." *Baird v. Bd. of Educ. for Warren Cmty. Unit Sch. Dist. No. 205*, 389 F.3d 685, 694–95 (7th Cir. 2004).

The parties seem to take it as a given that the fact-finding review described in Metra's Handbook would satisfy any constitutionally required process for Frakes's demotion. *See* Employee Conduct (Dckt. No. 69-10). As outlined in the Handbook, the purpose of Metra's fact-finding review is to "make a determination of fact(s) related to the alleged misconduct while providing the employee with full notice of the allegations, notice of the contemplated discipline . . . and an opportunity to refute the charges and otherwise respond." *Id.* at 7. An employee has post-deprivation relief available as well – he can always request a review of his assessed disciplinary action if he was initially afforded fact-finding review. *Id.* at 8.

The Court agrees that if Frakes was offered Metra's fact-finding review before his demotion, it would satisfy the constitutional requirements for pre-deprivation procedures. *See Bradley*, 929 F.3d at 882. In fact, Frakes *was* offered an opportunity for fact-finding review, but he passed on the opportunity.

Frakes simultaneously accepted his demotion and waived fact-finding review. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 53 (Dckt. No. 79); Demotion Form, at 2 (Dckt. No. 69-12). The Demotion Form summarized the accusations that Frakes had made against

Frencher, including the notion that he was "insubordinate," "inappropriately pounded on your office door," and "physically threatened [Frakes]." *See* Demotion Form, at 1. The Committee found that the video did not support Frakes's story: "the alleged confrontation described by [Frakes] as reason for removing Mr. Frencher from service was captured on video. This video was reviewed by a committee of Senior Level Management and was found to not support [Frakes's] allegations." *Id.*; *id.* at 2 (citing the "consensus from a committee of Senior Level Management that a video did not support your justification to remove an employee from service").

Based on the false story, the Committee demoted Frakes to the position of Senior Rail Inspector and reduced his salary, too. *Id.* at 2. Frakes agreed to the demotion by signing the form: "This information was presented to you on September 26, 2017 at 547 headquarters where you agreed to these terms. Please indicate your concurrence by signing above your name on the line below." *See* Demotion Form, at 2 (Dckt. No. 69-12). Frakes signed the form on September 27, 2017, one day after the Disciplinary Committee meeting, and two days after the incident with Frencher. *Id.*

The form itself says nothing about Frakes's waiver of fact-finding review. But the parties agree that an employee in the Metra Mechanical Department waives further review by accepting an alternative "lesser discipline" for rules violations. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 18 (Dckt. No. 79) (admitting that the Mechanical Department offers employees a choice between fact-finding review of the charges, or "accepting an alternative lesser discipline in lieu of a Fact-Finding Review"); *id.* at ¶ 19 (admitting that an employee "waives a Review by

accepting what may be an alternative discipline"[3]).  Indeed, Frakes refers to the Demotion Form as a "form to waive his right to a fact-finding hearing" and a "waiver form" in his brief.  *See* Frakes Mem., at 2, 10 (Dckt. No. 78).

Frakes also acknowledges that Defendants McCann and Clifford provided him with the form and, at the same time, asked him to waive additional review.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 52–53 (Dckt. No. 79) (stating that Plaintiff "was given the option of moving forward with a Fact-Finding review of the event or accepting a demotion to Sr. Rail Inspector," and that he "signed the wavier and accepted the Sr. Rail Inspector position").  While the parties dispute if *other* Defendants told Frakes that he was waiving a hearing, the crucial point remains:  Frakes's signature on the Demotion Form functioned as a waiver of pre-deprivation fact-finding review.  *See* Pl.'s Statement of Additional Facts, at ¶ 29 (Dckt. No. 80) (stating that Defendants "jointly provided Frakes with a letter, and asked him to waive his right to a fact-finding hearing"); Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 29 (Dckt. No. 98).

Frakes responds that he signed the waiver form only because he knew the fact-finding review would be a "sham."  *See Ryan v. Illinois Dep't of Child. & Fam. Servs.*, 185 F.3d 751, 758 (7th Cir. 1999) ("A plaintiff who can introduce evidence that the decision has already been made and any hearing would be a sham is entitled to go forward with a procedural due process claim.").  He claims that they gave him only 10 minutes to sign the waiver.  *See* Pl.'s Statement of Additional Facts, at ¶ 29 (Dckt. No. 80).  And in his view, the result was foreordained,

---

[3]  Frakes objected to this statement as a "legal conclusion" that the decision constituted a "waiver."  *Id.* But it's not really a legal conclusion.  The statement has to do with the existence of a procedure to challenge a decision.  However you spin it, the simple reality is that Frakes had an opportunity to challenge the demotion, but he took a pass.

because McCann told him that nothing would change even if he chose to proceed with fact-finding review. *Id.*

The first argument is off base. He had more than 10 minutes to think about whether to sign and waive the fact-finding process. In fact, the company gave him time to think it over, and sleep on it. Frakes alleges that McCann pointed to the waiver letter on September 26 and told Frakes that he had 10 minutes to sign it. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 52 (Dckt. No. 79); Frakes Dep., at 169:20-24 (Dckt. No. 69-6). In reality, Frakes signed it the *next day*, on September 27. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 53.

Frakes tries to explain away the chronology, but he doesn't get very far. He claims that they told him on September 26 that he had 10 minutes to sign, but the letter wasn't submitted to him until the 27th. *See* Frakes Dep., at 170:1 – 171:16 (Dckt. No. 69-6). That's not much of a response. The simple reality is that he heard about his options on one day, and he made his decision the next day.

The second argument is not much better. Frakes claims that the choice was not real because the process was a sham. According to him, during the meeting on September 26, McCann told him that his demotion "was already predetermined and we're not changing our minds. This is what we're going with." *See id.* at 275:20-22.[4]

McCann's alleged statement doesn't render the entire procedure "a sham." Even if McCann did tell Frakes that his mind was made up, the Disciplinary Committee had at least six members, and one of those members explained that the Committee wouldn't know the outcome of the review process until its completion. *See* Defs.' Resp. to Pl.'s Statement of Additional

---

[4] McCann denies that he told Frakes that a demotion was inevitable. *See* McCann Dep., at 138:10-21 (Dckt. No. 69-3). But this Court does not decide who to believe at the summary judgment stage. Frakes presented evidence about what McCann said, and the Court must accept the well-supported facts of the non-movant at the summary judgment stage. So the Court assumes that McCann said it.

Facts, at ¶ 26 (Dckt. No. 98); McCann Dep., at 127:20 – 128:16 (Dckt. No. 69-3); Clifford Dep., at 83:4-10, 91:9 – 93:2 (Dckt. No. 69-2).

Frakes presents no evidence showing that McCann represented the Committee, or that McCann convinced other members to rule against Frakes, or that other members also felt that the decision was predetermined. McCann's alleged statement, standing alone, does not undermine the fact that Frakes failed to pursue the procedural protection that Metra offered him. *See Baird*, 389 F.3d at 694–95; *see also Cunliffe v. Wright*, 51 F. Supp. 3d 721, 738 (N.D. Ill. 2014) ("[Plaintiff] makes conclusory allegations that it was a 'sham hearing,' but does not allege sufficient facts to support that she did not receive an adequate hearing.") (citation omitted).

In any event, even if McCann's purported statement rendered the entire pre-deprivation procedure a sham, it was not the end of the road. Frakes could have moved forward with fact-finding review and (if he was disciplined) requested *post*-deprivation relief. As already explained, the Handbook expressly provides that "[e]mployees who believe they have been disciplined unfairly may request a review of the underlying charges and/or discipline assessed . . . ." *See* Employee Conduct, at 7 (Dckt. No. 69-10). Metra's Chief Human Resources Officer oversees employee requests for review and "will take whatever steps he or she deems appropriate" in response.[5] *Id.* at 8.

Frakes never mentions the existence of post-deprivation review. There is no evidence in the record suggesting that Metra's post-deprivation remedies were inadequate, or calling into

---

[5] The Court assumes that the all-encompassing phrase "whatever steps he or she deems appropriate" includes full administrative review, when appropriate. *See Veterans Legal Def. Fund v. Schwartz*, 330 F.3d 937, 941 (7th Cir. 2003) (discussing an opportunity to pursue administrative review). There is nothing in the record suggesting that the post-deprivation hearing was restricted in any way, procedurally or substantively.

question the integrity of Metra's Chief Human Resources Officer. There is no evidence in the record that the post-deprivation remedy was a sham.

There is nothing in the record suggesting that Frakes lacked adequate post-deprivation relief. And if Frakes was able to seek post-deprivation relief, then any problems with his pre-deprivation hearing could have been corrected. The Seventh Circuit has recognized the ameliorative effect of adequate post-deprivation remedies on sham pre-deprivation hearings. *See Schacht v. Wis. Dep't of Corrs.*, 175 F.3d 497, 503 (7th Cir. 1999) ("[The plaintiff's] procedural due process claim fails in the end because it lacks an adequate basis in fact, and because, even if he could prove his claim, he had adequate post-termination administrative remedies he could have pursued."), *overruled on other grounds by Higgins v. Mississippi*, 217 F.3d 951, 954 (7th Cir. 2000).

Similar reasoning applies here. Frakes had access to adequate post-deprivation relief that he could have pursued, but he chose to waive it. That post-deprivation relief would have resolved his concerns with his pre-deprivation hearing (*i.e.*, that it was predetermined). Frakes has not challenged the adequacy of available post-deprivation review, so he cannot now claim that Defendants deprived him of due process. *See Baird*, 389 F.3d at 694–95; *cf. Veterans Legal Def. Fund v. Schwartz*, 330 F.3d 937, 939–40 (7th Cir. 2003) ("For some deprivations due process includes a predeprivation hearing, but 'post-deprivation remedies are a constitutionally acceptable substitute for predeprivation remedies in many procedural due process cases.'") (citing *Wudtke v. Davel*, 128 F.3d 1057, 1063 (7th Cir. 1997)).

Summary judgment is therefore appropriate on Frakes's first claim of a denial of due process, to the extent that his claim relies on Metra's alleged insufficient procedural protections before his demotion.

### iii. Qualified Immunity

Without expressly saying it, Frakes's complaint sued the individual Defendants in their individual (not official) capacities. *See* Second Am. Cplt., at ¶¶ 21–24 of Count I (Dckt. No. 24). The individual Defendants are government actors who performed a discretionary function in demoting Frakes. So qualified immunity is an available defense. *See Bakalis v. Golembeski*, 35 F.3d 318, 326–27 (7th Cir. 1994) ("Qualified immunity is an individual defense available to each individual defendant in his individual capacity."); *Abbott v. Sangamon County*, 705 F.3d 706, 713 (7th Cir. 2013) ("Governmental actors performing discretionary functions are entitled to qualified immunity from suits for damages."); *see also Hanson v. LeVan*, 967 F.3d 584, 592 (7th Cir. 2020) (analyzing qualified immunity as it applies to a township assessor's decision to fire employees); *Sonnleitner*, 304 F.3d at 716–17 (applying qualified immunity to four individual supervisors of a state-run mental health institute and their disciplinary decision regarding an employee).

"Qualified immunity shields a government official from suit when the official is performing a discretionary function and his conduct does not violate clearly established rights of which a reasonable person would have known." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 572 (7th Cir. 2014). Qualified immunity gives state officers the benefit of the doubt when they make decisions without crossing well-established boundaries. "'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.'" *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

In order to proceed against state actors, Frakes "must (1) adequately allege the violation of a constitutional right, and (2) show the right was clearly established at the time of the alleged violation, such that a reasonable public official would have known that his conduct was

unlawful." *Atterberry v. Sherman*, 453 F.3d 823, 826 (7th Cir. 2006). However, "[t]his order of inquiry is not rigid," and courts may address either question first. *See Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018).

To show that a right was clearly established, a plaintiff must demonstrate that existing case law at the time of the challenged conduct "'placed the statutory or constitutional question beyond debate.'" *Dockery*, 911 F.3d at 466 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "[T]o place the constitutional question beyond debate, the precedent must be particularized to the facts of the case." *Id.* at 466 (cleaned up); *see City of Escondido v. Emmons*, 139 S. Ct. 500, 504 (2019) ("While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular action beyond debate."). "Qualified immunity cannot be defeated simply by alleging a violation of extremely abstract rights." *Dockery*, 911 F.3d at 466 (cleaned up).

Alternatively, a plaintiff may overcome qualified immunity by persuading the court that the conduct in question is so egregious and unreasonable that, despite the lack of an analogous decision, no reasonable public officer could have thought she was acting lawfully. *Id.* at 466–67. Such "obvious cases" are "rare." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018).

As already discussed, Frakes has not adequately alleged a violation of his constitutional right to due process. But even if he did, Frakes still bears the burden of establishing the existence of a clearly established constitutional right. *See Sonnleitner*, 304 F.3d at 716–17. He has failed to satisfy this burden.

First, Frakes did not cite *any* authority to support the notion that Defendants violated a clearly established right. Instead, he repeats his allegations of a denial of due process. *See*

Frakes Mem., at 7–8 (Dckt. No. 78). On this ground alone, Frakes has not met his burden and summary judgment is appropriate.

While Frakes did not cite them, the two closest analogous cases do not place the lawfulness of Defendants' actions beyond debate. In *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985), the Court held that the procedural due process rights of two school district employees were violated when they were fired by their employer without the benefit of a pre-termination hearing. *Id.* at 547–48.

But *Loudermill* involved public employees who were discharged without any pre-termination proceedings. Unlike them, Frakes had lots of pre-demotion remedies at his disposal. Before his demotion, Frakes submitted a written statement on the incident. He was informed of a pre-termination proceeding, and he was provided with notice of the charges brought against him. *Loudermill* does not constitute a clearly established right applicable to Frakes's case.

The court's decision in *Sonnleitner* is distinguishable as well. There, a nurse at a state-run mental health institute was demoted after an inadequate pre-disciplinary hearing and an extensively delayed post-disciplinary appeal. *See Sonnleitner*, 304 F.3d at 706, 713–14. In that case, there was no question as to plaintiff's waiver of any hearing, and the court began by noting that the plaintiff's property interest in his specific position was "undisputed" because of a Wisconsin statute that expressly protected employees from demotions without just cause. *Id.* at 711. Frakes, in contrast, chose to forgo fact-finding review – notwithstanding his belief that the review would be a sham – and there was no statute expressly establishing his property interest in his position as superintendent. There was also no risk of undue delay in his ability to seek post-deprivation review.

Second, this case is not one of the "rare" cases involving conduct that is so egregious that no analogous case law is necessary. *Cf. Hope v. Pelzer*, 536 U.S. 730, 733–35, 744–46 (2002) (denying qualified immunity to prison guards for the "obvious cruelty" of handcuffing a shirtless inmate to a hitching post in the sun for seven hours with no bathroom breaks and limited water, despite no analogous case law). In the grand scheme of things, the conduct in question is not so egregious. So Frakes needed to provide analogous precedent showing his clearly established right, and he didn't.

Frakes has the burden of showing his clearly established right, and he has failed to cite any authority or show the egregious character of the individual Defendants' behavior. Frakes did not come forward with evidence of a violation of his constitutional right to due process on the grounds of inadequate procedural protections. But even if he had done so, Defendants would be entitled to qualified immunity.

### B.      Involuntary Resignation (Theory II).

Frakes's second amended complaint also includes an involuntary resignation claim. *See* Second Am. Cplt., at ¶ 22 of Count I (Dckt. No. 24) (alleging Defendants deprived Plaintiff of his property interest without due process by "subject[ing] him to a hostile work environment, forcing him to retire earlier than he originally planned"). While Frakes brings his involuntary resignation claim under the Due Process Clause, the same analysis applies as if he brought it under Title VII. *See Palka v. Shelton*, 623 F.3d 447, 453 (7th Cir. 2010); *see also* Frakes Mem., at 19–21 (Dckt. No. 78) (referencing Title VII cases).

There are two types of "involuntary resignation" claims: constructive discharge and coerced resignation. *See Ulrey v. Reichhart*, 941 F.3d 255, 261 (7th Cir. 2019). Constructive discharge resembles a hostile work environment claim. It may occur "when an employer makes

employment so unbearable that an employee resigns." *Id.* (cleaned up). Frakes must show "harassing behavior sufficiently severe or pervasive to alter the conditions of [his] employment, and that the abusive working environment became so intolerable that [his] resignation qualified as a fitting response." *Levenstein v. Salafsky*, 414 F.3d 767, 774 (7th Cir. 2005) (quotation marks and citation omitted). Coerced resignation, on the other hand, is "characterized by the presence of a Hobson's choice in which the employee must resign or suffer severe consequences, such as facing criminal charges." *Palka*, 623 F.3d at 453.

Frakes asserts both theories, but they fail for a simple reason: there is no evidence that Defendants subjected him to an "unbearable" working environment or that he was presented with a "Hobson's choice" and picked resignation.

Frakes relies on four facts in support of his claim (under either theory): (1) his "humiliating" September 25 meeting with the individual Defendants to discuss the Frencher incident; (2) his nickname of "Brucifer"; (3) the presence of "vaping smoke" indoors; and (4) someone asked him to troubleshoot the main generators as a Sr. Rail Inspector. *See* Frakes Mem., at 2, 20–21 (Dckt. No. 78).

These facts don't cut it. Maybe the September 25 meeting was "humiliating," but the humiliation stemmed from the falsity of Frakes's own story. The managers watched the video, saw that Frakes overstated what happened, and confronted Frakes with the truth. Any humiliation was self-imposed.

And even then, the September 25 meeting did not lead to his discharge. He was demoted, not fired. He kept a job with Metra, and he did not resign for three more months.

28

The other facts cannot support a claim, either. The working conditions might have been uncomfortable, but they were far from unbearable. He wasn't presented with a Hobson's choice, either.

Indeed, Frakes's own behavior during his time on the job undermines their severity. He never asked his supervisors to stop calling him "Brucifer." He never asked them to stop vaping around him, and he presented no evidence that vaping harmed his health. He never complained about troubleshooting a main generator, let alone complained that it was dangerous. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 59, 63–65 (Dckt. No. 79).

Based on these facts, no reasonable jury could return a verdict for him on either theory of involuntary resignation.

Frakes didn't like his job and he wasn't happy about his demotion, so he left. That's not enough to support a federal claim.

## II. Discrimination (Count II)

The last claim is reverse race discrimination. Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual . . . because of such individual's race . . . ." *See* 42 U.S.C. § 2000e–2(a)(1). An employee may show such incidents of illegal discrimination through direct proof, or in the absence of such proof, an employee may make a case with sufficient indirect proof, and upon doing so, switch the burden of proof to the employer." *See Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003).

More recently, the Seventh Circuit has shifted away from these two methods (without disapproving of them). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Ortiz v. Werner Enters., Inc.*, 834

F.3d 760, 765 (7th Cir. 2016). To that end, the Court must consider "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [race] caused the discharge." *Id.*

Where, as here, a plaintiff brings a reverse-race discrimination claim, the plaintiff must show "background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against whites or evidence that there is something fishy about the facts at hand." *Phelan*, 347 F.3d at 684 (cleaned up).

Frakes's reverse-race discrimination claim fails, for several reasons. First, there are no background circumstances showing that Metra was inclined to discriminate against whites. Two of the individual Defendants who Frakes accuses of discrimination are white (McCann and Clifford). *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 3, 6 (Dckt. No. 79). The person who replaced him as superintendent is white. *Id.* at ¶ 54. Frakes never heard any derogatory statements about his race throughout his more than 20 years with Metra. *Id.* at ¶ 57.

Frakes also did not muster any evidence that Metra treated him less favorably than others. The record shows that Metra terminated a former superintendent who is black for falsifying records and demoted a superintendent who is Hispanic (Defendant Rojas) for violating the company vehicle policy. *See id.* at ¶¶ 72, 76 (Dckt. No. 79). While neither individual was involved in a quarrel with a subordinate employee, Frakes's demotion for lying cannot be considered an outlier.

Second, there is nothing fishy about Frakes's demotion. He got angry on the job, he pointed and yelled at a subordinate employee, and he lied about what happened. He did not meet Metra's legitimate job expectations when he quarreled with a fellow employee and falsely reported what happened. Frakes failed to come forward with facts showing his demotion was

30

pretextual, meaning a lie or a phony reason. *See Perez v. Illinois*, 488 F.3d 773, 777 (7th Cir. 2007) (defining pretext in the Title VII context). His reliance on Frencher and Thomas as comparators (who are both black employees) is unavailing. A jury, considering the evidence as a whole, could not conclude that Frakes was demoted because of his race.

### Conclusion

For the reasons stated above, Defendants' motion for summary judgment is granted.


Date: November 29, 2021                    _____

                                           Steven C. Seeger
                                           United States District Judge